**F I L E D**

**PUBLISH**

**AUG 11 2003**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES E. ADAMS; STANLEY R. LAMB; ANTHONY VARTULI, on behalf of themselves and all others similarly situated,

      Plaintiffs - Appellants,

v.

KINDER-MORGAN, INC., formerly known as KN Energy Inc.; LARRY D. HALL; CLYDE E. MCKENZIE, II; RICHARD KINDER,

      Defendants - Appellees.

No. 02-1208

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 00-N-516)**

---

Michael G. Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, Massachusetts (Michael T. Matraia, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, Massachusetts; Gary C. Davenport and Eric Beltzer, McGloin, Davenport, Severson & Snow, P.A., Denver, Colorado; and Curtis V. Trinko, Law Offices of Curtis V. Trinko, LLP, New York, New York, with him on the briefs) for Plaintiffs-Appellants.

Michael A. Noone, The Beatty Law Firm, P.C., Denver, Colorado (Michael L. Beatty and John E. Matter with him on the brief), for Defendant-Appellee Kinder-Morgan, Inc.

Susan Bernhardt, Netzorg, McKeever, Koclanes & Bernhardt, LLC, Denver, Colorado, for Defendants-Appellees Larry D. Hall and Clyde E. McKenzie.

Gayle Boone, Bracewell & Patterson, LLP, Dallas, Texas (J. Clifford Gunter III, Bracewell & Patterson, LLP, Houston, Texas, on the brief), for Defendant-Appellee Richard Kinder.

---

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **ARMIJO**, District Judge.[*]

---

**EBEL**, Circuit Judge.

---

The plaintiffs brought this lawsuit as a class action alleging securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of all people who purchased the common stock of KN Energy, Inc. ("Kinder-Morgan" or "the Company")[1] from October 30, 1997 to June 21, 1999 (the "class period"). The plaintiffs appeal the district court's dismissal of the case pursuant to Fed. R. Civ. P. 12(b)(6).

---

[*] The Honorable M. Christina Armijo, United States District Judge for the District of New Mexico, sitting by designation.

[1] In October 1998, after the events at issue in this litigation, KN Energy, Inc. merged with Kinder Morgan Delaware. The resulting company was named Kinder-Morgan, Inc., which is the successor-in-interest of KN Energy, Inc. and the corporate defendant in this case. We will refer to the corporate defendant as Kinder-Morgan even though during most of the period relevant to this case the corporate entity accused of wrongdoing by the plaintiffs was KN Energy, Inc.

The basis for the lawsuit is the plaintiffs' allegations that the defendants made misleading statements about Kinder-Morgan's profitability during the class period. They claim that the defendants reported that a key business of the Company was profitable when in fact it was losing money, and that Kinder-Morgan engaged in transactions that violated Generally Accepted Accounting Principles ("GAAP") and the Company's own accounting policy in order to inflate net income, even as the defendants reported that their financial reporting complied with GAAP. The defendants took these actions, the plaintiffs allege, to sell securities at favorable prices to finance an acquisition and to facilitate completion of a merger.

After the plaintiffs twice amended their complaint, the district court dismissed the complaint pursuant to Fed. R. Civ. P. 12(b)(6), stating that the second amended complaint failed to satisfy the pleading requirements for securities fraud established by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1) and (2). Section 78u-4(b)(1) requires plaintiffs to specify the statements by the defendants they allege were misleading, the reasons why the statements were misleading, and, if the allegations in their complaint are made upon information and belief, to state with particularity all facts supporting their belief that the statements were false or misleading. Section

78u-4(b)(2) requires that plaintiffs' allegations give rise to a strong inference of scienter.

We have previously ruled on what is required for plaintiffs to plead scienter sufficiently under § 78u-4(b)(2) of the PSLRA. See City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1248–49 (10th Cir. 2001). We have not yet, however, had occasion to rule on what is required to satisfy the pleading requirement of § 78u-4(b)(1) that facts supporting a complaint made on information and belief be stated with particularity in the complaint.

The district court had jurisdiction over this case pursuant to Section 27 of the Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and we have jurisdiction to review the district court's dismissal of the action under 28 U.S.C. § 1291. We hold that the second amended complaint pled facts with sufficient particularity to satisfy the § 78u-4(b)(1) standards for pleadings made on information and belief. We conclude, however, that the complaint adequately pleads scienter under § 78u-4(b)(2) only as to defendants Kinder-Morgan, Hall, and McKenzie. We also find that the complaint adequately pleads control person liability under § 78t(a) as to Hall and McKenzie, but not as to Kinder. Accordingly, we REVERSE the district court's dismissal of the complaint as to defendants Kinder-Morgan, Hall, and McKenzie. We AFFIRM the dismissal of the complaint as to Kinder.

# I. BACKGROUND

Because this is an appeal from a motion to dismiss, we accept all well-pleaded facts, as distinguished from conclusory allegations, as true. Ruiz v. McDonnell, 299 F.3d 1173, 1181 (10th Cir. 2002), cert. denied, 123 S. Ct. 1908 (2003).

At the time of the events underlying the complaint in this case, Kinder-Morgan was the nation's sixth largest integrated natural gas company and had more than $8 billion in assets. Its operations spanned sixteen states and included the gathering, processing, storage, marketing, and transportation of natural gas and natural gas liquids. During the class period, Larry D. Hall was president and chief executive officer of Kinder-Morgan, Clyde E. McKenzie was vice president and chief financial officer of the Company, and Richard Kinder was a director of the Company. The plaintiffs are investors who purchased shares of Kinder-Morgan common stock during the class period, October 30, 1997 to June 21, 1999.

The plaintiffs' securities fraud claims focus upon transactions and business operations in, and corporate reports and press releases related to, three areas of Kinder-Morgan's business: the Bushton Gas Processing Complex (the "Bushton Plant"), a contract to supply natural gas to the University of Colorado Cogeneration Plant (the "CU Cogen contract"), and a transaction with an alleged

shell company called Blue Moon Holdings. The crux of the fraud allegations is that Kinder-Morgan overstated its net income, and thereby masked operational problems, by accelerating the recording of income in violation of Generally Accepted Accounting Procedures.

## A.     The Bushton Plant

Kinder-Morgan purchased the Bushton Plant from Enron in March 1997. The plaintiffs allege that, despite Kinder-Morgan's statements to the contrary, the Bushton Plant was unprofitable during the third quarter of 1997 and was a significant cash drain on the Company. The Bushton Plant was initially unprofitable because Kinder-Morgan was obligated to make lease payments on the plant of $23 million per year. Immediately prior to the acquisition of the Bushton Plant, Rose Robeson, the Assistant Treasurer of Kinder-Morgan at the time, told defendant Clyde McKenzie and John DiNardo, a Kinder-Morgan vice president, that their positive financial projections for the plant were incorrect and that, because of the $23 million lease payment, the Bushton Plant would not be profitable. During the third quarter of 1997, McKenzie and DiNardo frequently went to Robeson's office to complain to her about how the Bushton Plant was losing money and to ask her how they could get out of the lease.

Another reason it was alleged that the Bushton Plant was unprofitable was the "keep whole" contracts to which the Plant was a party. Under such contracts, the Bushton Plant processed natural gas for third parties to remove natural gas liquids ("NGLs"), which Bushton sold separately from natural gas. In exchange for being able to keep the NGLs to sell itself, Bushton was obligated to "keep whole" the third parties for the reduction in the energy content of their natural gas stream associated with the removal of NGLs. That is, Bushton had to replace the NGLs with processed natural gas containing an equivalent amount of energy. As long as the market value of the processed gas that Bushton had to provide to keep the third parties whole was less than the value of the NGLs it sold for itself, it could turn a profit under the contracts. The risk under "keep whole" contracts, however, was the possibility of a price inversion. A price inversion is a market condition in which the value of the processed gas Bushton had to contribute under the contracts exceeded the value of the NGLs it extracted. In this situation, the contracts would be unprofitable. The complaint alleges that the Bushton Plant suffered from a price inversion affecting the profitability of its "keep whole" contracts. In the Spring of 1998, DiNardo held a meeting with employees to discuss the problems at the Bushton Plant, and at that meeting he reported that Bushton was generating losses of as much as $700,000 per month.

The complaint states that to hide the operational problems at the Bushton Plant, Kinder-Morgan accelerated, in violation of Generally Accepted Accounting Principles ("GAAP") and the Company's own revenue recognition policy, the recording of income from three contracts associated with the Bushton Plant.[2] Specifically, the plaintiffs point to contracts with three energy companies: Louis Dreyfus Natural Gas Corp., KMEP (an entity in which defendant Richard Kinder was chairman and CEO), and Koch Industries, Inc. By recording the income from these contracts before it had actually been earned and received, the plaintiffs allege that Kinder-Morgan inflated the Company's financial results for the 1997 third quarter and fiscal year.

The Dreyfus and KMEP contracts obligated Kinder-Morgan to store natural gas liquids over five-year periods in exchange for total payments of approximately $3.5 million. The Koch contract required Kinder-Morgan to refrain from operating a "butane liquid isomerization unit" at Bushton for a ten-year period, in exchange for payments totaling $18 million over the life of the

---

[2] The plaintiffs allege that GAAP includes the principle that revenue, and the income earned from that revenue, must be earned before it is recognized on a company's books. For example, when a company has a contract to provide services for a fixed price, the company should not record the receipt of the price for its services until they are actually delivered.

Kinder-Morgan appeared to embrace this principle in its own stated polices. The Company's 1997 Annual Report of Form 10-K stated: "(D) Revenue Recognition Policies. In general, the Company recognizes revenues as services are rendered or goods are delivered."

contract. The complaint alleges how Kinder-Morgan allegedly accelerated recognition of the income due under the contracts:

> In order to record inflated earnings, [Kinder-Morgan] reduced the Louis Dreyfus, KMEP and Koch contracts to their present value as of the third quarter of fiscal year 1997 and recorded the present value of the contract as income. The present value of the three contracts is approximately $14,300,000. Recording transactions in this manner violated GAAP because [Kinder-Morgan]'s performance obligations were not complete. The Company was still obligated to provide storage services and refrain from operating the isomerization unit well into the future. Under these circumstances, income should have been recorded ratably over the life of the contract. As a result of accelerating the revenue recognition, third quarter and fiscal year 1997 net income was overstated by approximately $14,300,000.

Second Am. Compl. at 23, ¶ 87. Without the accelerated income recognition, the Bushton facility would have recorded a loss of approximately $10 million in the third quarter of 1997 instead of the $5.1 million of operating income recorded by the company in the Form 10-Q it filed for that quarter. Despite the fact Bushton actually was losing money and had profits only because of the allegedly improper income recognition, Kinder-Morgan stated in reporting its financial results for the third quarter of 1997 that the Bushton plant "positively impacted [Kinder-Morgan's] earnings."

**B.  The CU Cogen Contract**

The plaintiffs allege that Kinder-Morgan also improperly accelerated the recognition of income related to its twelve-year contract to provide natural gas to

the University of Colorado cogeneration facility. Rather than simply book the present value of the future income from this contract as it did with the three Bushton contracts, Kinder-Morgan realized the present value of the CU Cogen profits by entering into an undisclosed contract with Enron. Under the terms of the deal, Enron paid Kinder-Morgan $6 million, which represented the estimated profit Kinder-Morgan was to realize during the four years that remained in the term of the CU Cogen contract. Enron made the one-time payment to Kinder-Morgan in the first quarter of 1998, and Kinder-Morgan recorded it as income during that quarter.

The deal with Enron involved the creation of a "dummy" corporation called Red Rock LLC. Enron owned 100% of the Class A shares of Red Rock, entitling Enron to all of Red Rock's dividends. Kinder-Morgan owned all of the Class B or C shares of Red Rock. The complaint alleges that Kinder-Morgan assigned the CU Cogen contract to Red Rock to create the appearance that it was not legally liable to provide the gas to the University of Colorado. In fact, Kinder-Morgan was still obligated to provide the gas required by the CU Cogen contract for the contract's duration. The complaint alleges, however, that when the CU Cogen plant paid Kinder-Morgan for the gas supplied, Kinder-Morgan forwarded these payments to Red Rock. Enron then would remove the payments from Red Rock as a dividend. Thus, the transaction permitted Kinder-Morgan to record

$6 million of income in the first quarter of 1998 without having completed its obligations under the CU Cogen contract as required by GAAP.

Arthur Andersen LLP, Kinder-Morgan's independent auditor, examined the CU Cogen transaction and questioned whether it complied with GAAP. The issue was resolved, the complaint alleges, when Kinder-Morgan management pressured Arthur Andersen to approve the transaction, and the auditor acquiesced. As a result of the improper booking of profits from the CU Cogen contract, Kinder-Morgan inflated the net income it reported for the first quarter of 1998 in its filings with the SEC. The $6 million profit recorded as a result of the Enron deal represented 27% of the $22.5 million in net income reported by Kinder-Morgan for the first quarter of 1998. Without the alleged improper income recognition, Kinder-Morgan would have reported net income of only $16.4 million for the first quarter of 1998.

## C.    The Blue Moon Transaction

The plaintiffs alleged that Kinder-Morgan engaged in another transaction involving a dummy corporation, this one called Blue Moon Holdings. This transaction occurred sometime in 1998 and involved the improper recognition of at least $2 million in income. The complaint provides no further details about this transaction.

**D.    Motives for Overstating Kinder-Morgan's Financial Results**

The plaintiffs allege two primary motives for the defendants' issuance of misleading statements about Kinder-Morgan's financial performance.  The first was their desire to have Kinder-Morgan issue securities to finance the Company's December 1997 acquisition of MidCon, a natural gas transmission and marketing subsidiary.  Kinder-Morgan engaged in four transactions in 1998 involving the issuance of approximately $ 4 billion in securities, and the plaintiffs allege that Kinder-Morgan overstated its financial performance to ensure that these securities would be sold at prices favorable to it.

The second alleged motive for the misleading statements was the defendants' desire to hide operational problems that could have undermined a planned merger with Sempra Energy that was announced in March 1999.   The plaintiffs alleged that the individual defendants stood to gain personally from a completed merger with Sempra.  Larry Hall allegedly would have received a $1.87 million severance package and a yearly consulting fee of $800,000 if the merger closed.  Clyde McKenzie allegedly would have received a severance payment of approximately $500,000.  Sempra walked away from the merger, however, when it allegedly discovered during due diligence Kinder-Morgan's improper accounting and the poor performance of the Company's operations.

When the Sempra merger collapsed, so did the price of Kinder-Morgan's common stock. On the last trading day prior to the announcement that the merger had been called off, Kinder-Morgan shares traded at $21.25 per share. On the day of the announcement, Kinder-Morgan stock fell to $12.81 per share.

**E.    Procedural History of the Litigation**

The plaintiffs filed their initial complaint and a first amended complaint in 2000. The first amended complaint was dismissed, with prejudice as to some claims and without prejudice as to others, in March 2001.[3] The plaintiffs filed their second amended complaint a month later, in April 2001.

At a hearing in March 2002, the district court entertained a motion by the defendants to dismiss the second amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). The court granted the motion and dismissed the second amended

---

[3] At the same time that the district court dismissed the first amended complaint, it dismissed a separate case brought by different plaintiffs who also alleged securities fraud claims against Kinder-Morgan. On appeal, we affirmed the district court's dismissal of that case. McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 999 (10th Cir. 2002). That case involved allegations that Kinder-Morgan failed to disclose certain future risks associated with the Bushton Plant when it reported its results from that operation. Id. at 994. As discussed in more detail below, because the plaintiffs' theory in McDonald was one of fraud by omission to disclose future risks, they conceded during their litigation that the financial information that Kinder-Morgan reported in the 1997 third quarter 10-Q was accurate. In contrast, the plaintiffs in the instant case claim that statements made by Kinder-Morgan in the 1997 third quarter 10-Q and elsewhere are inaccurate and materially misleading as stated.

complaint with prejudice, concluding that the plaintiffs had failed, with respect to the Bushton claims and the Blue Moon Holdings claim, to meet the requirement of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(1) and (2), to plead facts supporting their allegations with particularity and to plead allegations supporting a strong inference of scienter. The court found that the plaintiffs had pled facts with sufficient particularity about the CU Cogen contract, but concluded that claim should be dismissed because it did not meet the PSLRA's requirements that the allegations in the complaint support a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). Having dismissed the underlying securities fraud claims against both Kinder-Morgan and the individual defendants, the court also dismissed the claims of derivative liability—the § 20 claims of control person liability—against the individual defendants. The district court delivered these rulings from the bench and subsequently entered a written final judgment summarizing them, which the plaintiffs now appeal.

## II. DISCUSSION

"We review de novo the district court's dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted." Ruiz, 299 F.3d at 1181.

**A.    Scope of the District Court's Review of the Complaint**

    1.    Review of the Complaint In Its Entirety

The plaintiffs first attack the district court's decision to dismiss their complaint by arguing that the court failed to consider the complaint's allegations in their entirety.  When evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the district court must evaluate "the totality of the pleadings" to determine if the plaintiffs have stated an actionable claim of securities fraud.  See City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1261–62 (10th Cir. 2001).  The plaintiffs contend that while the district court did consider the allegations about the acceleration of income under the three Bushton contracts, the court did not consider Kinder-Morgan's public statements about Bushton's having made a "positive impact" on earnings, which the plaintiffs allege were false and misleading.  The plaintiffs state that their complaint "alleges a black-and-white contradiction between what Defendants said during the Class Period about Bushton's purported 'positive impact' on the Company's earnings and the value of the assets, and what they really knew or recklessly disregarded regarding the plant's money-losing operations and impaired condition."

We conclude that the district properly considered the complaint in its entirety for two reasons.  First, the district court said that it did.  In the hearing at

which the district court gave its oral ruling dismissing the second amended complaint, the court said:

> The next question is whether the pleading in this case . . . is sufficient to raise a strong inference of scienter. And <u>once again,</u> I've examined the authorities and the pleadings. <u>I've considered the pleadings in their totality</u> to determine whether the plaintiffs have pleaded facts supporting a strong inference of scienter.

Hr'g on Mot. to Dismiss at 7 (emphasis added). In light of the district court's express statement that it considered the pleadings in their entirety, we have no reason to conclude otherwise. <u>See</u> <u>Abrams v. Baker Hughes, Inc.</u>, 292 F.3d 424, 431 (5th Cir. 2002) ("[I]n its conclusion, the district court also stated that the facts in the complaint were insufficient when viewed in the aggregate . . . . The district court's clear statement that it considered the allegations insufficient in the aggregate, although without analysis, is difficult for us to contradict."). Although the court did not explicitly refer to the plaintiffs' allegations that Kinder-Morgan's statements about Bushton's "positive impact" on 1997 third quarter earnings were misleading, the court was not required to make explicit findings of fact and conclusions of law when making a Rule 12(b)(6) ruling. <u>See</u> Fed. R. Civ. P. 52(a) ("Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 . . . .").

Second, in the written final judgment dismissing the second amended complaint, the court expressly referred to the press release and SEC filings that

- 16 -

contained the Bushton statement. The court specifically mentioned "plaintiffs' allegations concerning defendants' press releases and 1997 10-Q and 10-K filings with the Securities and Exchange Commission." Final J. at 2. This reference to the sources of the Bushton statement supports the conclusion that the district court did, in fact, consider the statement when it decided to dismiss the complaint. For these reasons, we reject the plaintiffs' contention that the district court failed to consider its allegations about the Bushton statement.

2.    Issue and Claim Preclusion

The defendants argue that issue and claim preclusion bar any of the plaintiffs' claims. We turn first to the defendants' claim of issue preclusion.

a.)    Issue Preclusion

According to the doctrine of issue preclusion, when "an issue of ultimate fact has been once determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." United States v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002) (quotation and citation omitted). The defendants here have the burden of establishing issue preclusion, In re King, 103 F.3d 17, 19 (5th Cir. 1997), and four elements must be shown: "(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party,

to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." Botefuhr, 309 F.3d at 1282 (quoting Dodge v. Cotter Corp., 203 F.3d 1190, 1197 (10th Cir. 2000)).

The defendants argue that issue preclusion bars the plaintiffs from litigating issues of the materiality or the accuracy of the statements made in Kinder-Morgan's 1997 10-K and 10-Q filings. They contend that our decision in the case of McDonald v. Kinder-Morgan, Inc., 287 F.3d 992 (10th Cir. 2002), decided these issues. Although the plaintiffs in McDonald were different from the plaintiffs here, we need not decide if the two sets of plaintiffs are in privity because we conclude, in any event, that the defendants' argument fails because the critical factual issue—whether Kinder-Morgan's statements about the Bushton plant in its 1997 10-Q and 10-K filings were accurate—was not adjudicated on the merits in McDonald.

In Botefuhr, we held that "[i]n the issue preclusion context, the underlying issue must have been adjudicated on the merits." Botefuhr, 309 F.3d at 1282. We explained:

> A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action.
> . . . .
> An issue is not actually litigated if the defendant might have interposed it as an affirmative defense but failed to do so; nor is it

actually litigated if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in an allegation by one party and is admitted by the other before evidence on the issue is adduced at trial . . . .

Id. at 1282 (quoting Restatement (Second) of Judgments § 27 cmt. e at 256-57 (1982)).

The factual accuracy of Kinder-Morgan's statement made about the Bushton plant in the 1997 third quarter 10-Q and 10-K was not litigated in McDonald. McDonald was admittedly a securities fraud case against Kinder-Morgan, but it was filed by different plaintiffs who relied on a different theory of fraud. The plaintiffs in that case conceded for the purposes of their litigation the factual accuracy of the statements in the 10-Q and 10-K about the Bushton Plant and Kinder-Morgan's earnings and they attempted to predicate liability only upon the alleged failure of Kinder-Morgan to disclose future risks to future earnings because of the "keep whole" provisions in some of the Bushton contracts. McDonald, 287 F.3d at 994, 996–97, 998. The concession by the plaintiffs in McDonald means that the issue of the factual accuracy of the Bushton statement and Kinder-Morgan earnings for the historical periods covered in the financial reports was never litigated and, because these are the issues in this case, issue preclusion should not apply. Botefuhr, 309 F.3d at 1282.

b.) <u>Claim Preclusion</u>

The defendants also argue that claim preclusion bars the plaintiffs from making allegations about the Bushton statement. They argue that the district court order of February 23, 2002, dismissing the first amended complaint precluded the plaintiffs from making additional claims about the factual accuracy of Kinder-Morgan's financial reports and press releases. But the district court did not enter a final order at that time. At the hearing at which the court ruled on the second amended complaint, the defendants challenged that complaint by, *inter alia*, arguing that it contained allegations that were outside the scope of the repleading permitted by the February 2001 order—e.g., that it was false and misleading to say in the 1997 third quarter financial reports that Bushton positively impacted earnings. But the district court rejected this objection, finding that it was "inclined . . . to permit the amendment." Hr'g on Mot. to Dismiss at 4–5. The district court therefore modified its earlier order by considering on the merits the claims contained in the second amended complaint.

It is the defendants burden to establish claim preclusion, <u>Nwosun v. General Mills Restaurants, Inc.</u>, 124 F.3d 1255, 1257 (10th Cir. 1997), and given the uncertainty surrounding the district court's action, we cannot conclude that the defendants have met this burden.

- 20 -

**B. Pleading Requirements of the PSLRA**

Section 10(b) the Act, 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent acts done in connection with securities transactions. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 identifies certain actions that are prohibited by the statute. In particular, Rule 10b-5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5.

To state a claim under Rule 10b-5 for securities fraud, we have held that a plaintiff's complaint must contain allegations addressing the following five elements: (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading

- 21 -

statements; and (5) the plaintiff suffered damages as a result of his reliance. See Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997). Prior to passage of the PSLRA, Fed. R. Civ. P. 9(b) set the standard for the level of particularity required when pleading the elements of a securities fraud claim. City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1258 (10th Cir. 2001). Rule 9(b) dictates that "in averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally."

In 1995, Congress heightened the pleading standard for federal securities fraud claims with the passage of the PSLRA. See Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737. The purpose of the PSLRA was to curb perceived abuses in the prosecution of private securities fraud lawsuits, "particularly the filing of strike suits." Fleming Cos., 264 F.3d at 1258 (internal quotation marks omitted). To achieve its purpose, the PSLRA did not add to the list of the five elements that make up the 10b-5 cause of action; instead, it strengthened what is required adequately to plead two of those elements. See 15 U.S.C. § 78u-4(b)(1), (2).

First, the PSLRA increased the burden on a plaintiff's pleading of the first element of a securities fraud action: the allegation that the defendant made a false

or misleading statement, or failed to state a material fact necessary to make statements made not misleading.  The PSLRA requires that

> [i]n any private action arising under this chapter in which the
> plaintiff alleges that the defendant—
>     (A) made an untrue statement of material fact; or
>     (B) omitted to state a material fact necessary in order to make
>     the statements made, in the light of the circumstances in which
>     they were made, not misleading;
> the complaint shall specify each statement alleged to have been
> misleading, the reason or reasons why the statement is misleading,
> and, if an allegation regarding the statement or omission is made on
> information and belief, the complaint shall state with particularity all
> facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Second, the PSLRA heightened the standard for pleading the scienter element of a securities fraud claim.  Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of mind may be averred generally."  The PSLRA supersedes this part of Rule 9(b), imposing a more stringent rule for pleading scienter:

> In any private action arising under this chapter in which the plaintiff
> may recover money damages only on proof that the defendant acted
> with a particular state of mind, the complaint shall, with respect to
> each act or omission alleged to violate this chapter, state with
> particularity facts giving rise to a strong inference that the defendant
> acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2); Fleming Cos., 264 F.3d at 1255 n.13.

The district court held that the second amended complaint failed to satisfy the heightened pleading standards imposed by the PSLRA because it did not plead

- 23 -

the circumstances of fraud with particularity and it did not plead facts supporting a strong inference that the defendants acted with scienter. Specifically, the court concluded that the allegations relating to the Bushton Plant and Blue Moon Holdings were not pled with sufficient particularity. While finding that the allegations relating to the CU Cogen contract were pled with sufficient particularity, the district court concluded that the facts alleged did not raise a strong inference that the defendants acted with scienter with regard to any of the alleged false statements. We disagree with the district court and conclude that the plaintiffs' complaint satisfies the pleading requirements of the PSLRA.

1. <u>Pleading the Circumstances of Fraud with Particularity Under the PSLRA</u>

We begin by applying the requirements of § 78u-4(b)(1) that apply to every securities fraud claim: that "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Then, we consider whether the additional requirement of § 78u-4(b)(1)—that when allegations are made on information and belief the complaint "shall state with particularity all facts on which that belief is formed"—is applicable to this case. <u>Id.</u> Concluding that it is applicable, we apply that standard to the plaintiffs' allegations and conclude that it is satisfied.

a.)     The Misleading Statements

The plaintiffs' complaint clearly sets out the allegedly misleading statements and the reasons why the statements are claimed to be misleading. The complaint points to Kinder-Morgan's Form 10-Q and Form 10-K filings made between October 1997 and March 1999, in which it allegedly reported misleading net income figures for the Company and misleading operating income figures for the Bushton Plant. In addition to several of these SEC filings, the Company's press releases announcing its results for the third and fourth quarters of 1997 stated, in varying formulations, the allegedly misleading claim that the Company's earnings "were positively impacted by earnings from the Bushton [Plant] . . . ." The plaintiffs also allege that the SEC filings were misleading when they stated that Kinder-Morgan's financial statements were prepared in accordance with GAAP.

The complaint explains why these statements are alleged to be misleading. It states that "Bushton did not 'positively impact earnings' . . . [because] it was unprofitable and a substantial cash drain on the Company . . . ." The complaint states that Bushton was unprofitable because of the sizable lease payment Kinder-Morgan was obligated to make on the Plant and the fact that "keep whole" contracts with customers of the Bushton Plant were losing money due to unfavorable market conditions.

Furthermore, the complaint explains that those figures included income that, under GAAP and the Company's own income recognition policies, should not have been recorded. In particular, the complaint points to the accelerated recognition of income from the three Bushton contracts and from the CU Cogen contract as examples of improperly recorded income. The complaint states that but for the allegedly improper income recognition, the Bushton facility would have recorded a loss of approximately $10 million in the third quarter of 1997, instead of the $5.1 million operating profit recorded by the company in the Form 10-Q filed for that quarter. In addition, the complaint states that without the allegedly improper income recognition from the CU Cogen contract, Kinder-Morgan would have reported net income of $16.4 million for the first quarter of 1998, instead of the $22.4 million actually recorded.

Finally, the complaint states that it was misleading for the Company to state that its financial statements were prepared according to GAAP because, according to the complaint, they were not. The complaint alleges that a fundamental principle of GAAP is that revenue and income are not recognizable until the good or service that is due has actually been provided. In the case of the three Bushton contracts and the transaction with Enron regarding the CU Cogen contract, the complaint alleges that Kinder-Morgan booked income for services that it had not yet delivered.

Based on the foregoing detailed allegations, we find that the plaintiffs' complaint clearly sets forth the statements they alleged to be misleading and the reason or reasons why those statements were misleading.  See 15 U.S.C. § 78u-4(b)(1).

        b.)      Applicability of the Standard for Pleadings Made on Information and Belief

We next turn to whether the allegations in the plaintiffs' complaint were made on information and belief, thereby triggering the requirement that the complaint "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The plaintiffs argue that this requirement does not apply to their complaint because their complaint is "based on counsel's investigation[, which] is *not* the same as a complaint pled upon information and belief."  We disagree.

Courts have split on the question whether allegations in a complaint made upon "investigation of counsel" should be treated as being made on information and belief for the purposes of the heightened pleading standard of the PSLRA. Compare, e.g., ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 351 n.70 (5th Cir. 2002) ("We also agree with those courts which have held that allegations made on 'investigation of counsel' are equivalent to those made on 'information and belief' for the purposes of the heightened pleading requirements under 15 U.S.C. § 78u-4(b)(1)."), In re Theragenics Corp. Sec. Litig., 105 F.

Supp. 2d 1342, 1351 (N.D. Ga. 2000) (same), In re Equimed, Inc. Sec. Litig., No. 98-CV-5374 NS, 2000 WL 562909, Fed. Sec. L. Rep. (CCH) ¶ 90,975 at 94,324 (E.D. Pa. May 9, 2000) ("To distinguish between 'information and belief' and 'investigation of counsel' is meaningless; it would permit evasion of the clear intent of the statutory mandate."), and Brady v. Anderson, No. 97-2154(SHx), 1998 U.S. Dist. LEXIS 20774, at *11–12 (C.D. Cal. 1998) (refusing to consider investigation of counsel as distinct from information and belief), with Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp., 2 F. Supp. 2d 1345, 1353–54 (D. Colo. 1998) (holding that plaintiffs did not plead on information and belief where their allegations were based "upon the investigation of their counsel"), and Warman v. Overland Data, Inc., No. 97CV833 JM (JFS), 1998 WL 110018, at *3 (S.D. Cal. Feb 20, 1998) (stating that because "plaintiffs have pled their allegations based on the investigation of the attorney and not upon information and belief, the complaint need not state with particularity all the facts on which the belief is formed"). This is a question of first impression in our Circuit—among circuit courts only the Fifth has addressed it thus far—and we conclude, like the Fifth Circuit, that the better view is espoused by the cases equating allegations made upon investigation of counsel with those made upon information and belief.

We are persuaded by the district court's reasoning in <u>In re Theragenics</u>

<u>Corp.</u>:

> The Court has reviewed the cases on point and agrees with those that hold that allegations based on the investigation of counsel are the equivalent of allegations based on information and belief. For this court to rule otherwise would elevate form over substance and allow plaintiffs to avoid the [PSLRA]'s mandate merely by cloaking with a license to practice law the information and belief on which a complaint is based. Rule 11 of the Federal Rules of Civil Procedure provides that, by presenting a pleading, motion, or other paper to a court, an attorney is certifying that he has conducted "an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). Prior to the [PSLRA], Rule 11 required that an attorney in every case must investigate claims before filing a complaint. Congress, rightly or wrongly, decided that the protection of Rule 11 against frivolous lawsuits was not enough. The Court must conclude that a bare recitation that the Complaint is based upon the investigation of counsel does not satisfy the pleading requirements of the [PSLRA].

105 F. Supp. 2d at 1351.

Because the plaintiffs' complaint refers to the investigation of their counsel as the basis for their allegations, we treat their complaint as having been made on information and belief. Therefore, with respect to their allegations that the financial results reported in Kinder-Morgan's SEC filings and press releases were false, and that the Company's statement that Bushton's operations positively impacted earnings was false, the plaintiffs' complaint also must "state with particularity all facts upon which [their] belief is formed." 15 U.S.C. § 78u-4(b)(1); <u>see also</u> <u>Flemming Cos.</u>, 264 F.3d at 1258.

c.)    The Content of the Standard for Pleadings Made on
       Information and Belief

Our Circuit has not yet had occasion to analyze what § 78u-4(b)(1) means when it says that where an allegation regarding the statement or omission is made on information and belief, "the complaint shall state with particularity all facts upon which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  When giving meaning to a provision of a statute, we begin with the plain language of the statute itself.  United States v. Green, 967 F.2d 459, 461 (10th Cir. 1992).  What is obvious in the text of this part of § 78u-4(b)(1) is that it requires a plaintiff to identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements.  Generalized or conclusory allegations of fraud will not be sufficient.

However, we agree with the courts that have concluded that "notwithstanding the use of the word 'all,' paragraph (b)(1) [of § 78u-4] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based."   Novak v. Kasaks, 216 F.3d 300, 313–14 (2d Cir. 2000); accord ABC Arbitrage Plaintiffs Group, 291 F.3d at 353; In re Cabletron Sys., Inc., 311 F.3d 11, 29–30 (1st Cir. 2002);  In re Theragenics Sec. Litig., 105 F. Supp. 2d at 1355.  But see In re Party City Sec. Litig., 147 F. Supp. 2d 282, 306 (D.N.J. 2001) ("[Novak] inexplicably read the

word 'all' out of the statute."). We reach this conclusion because to read "all" literally would produce absurd results that Congress could not have intended:

> Contrary to the clearly expressed purpose of the PSLRA, it would allow complaints to survive dismissal where "all" the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted.

Novak, 216 F.3d at 314 n.1; see also Long v. Bd. of Governors of the Fed. Reserve, 117 F.3d 1145, 1157 (10th Cir. 1997) (stating that the plain meaning of statutory text must control unless it would lead to absurd results). Moreover, it is unclear how a reviewing court could implement the standard if "all" were to be read literally. We wonder, for example, how a court could know whether a plaintiff had included in his complaint literally every relevant fact of which he has knowledge.

In answering the obvious next question—if literally all facts need not be pled, what facts must?—the Second Circuit concluded that "plaintiffs need only plead with particularity sufficient facts to support those beliefs." Id. at 313–14. The Novak court explained, "Our reading of the provision focuses on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Id. at 314 n.1; accord ABC Arbitrage Plaintiffs Group, 291 F.3d at 353 ("Under the interpretation of section 78u-

4(b)(1) we adopt today, a plaintiff must plead with particularity <u>sufficient</u> facts to support their allegations of false or misleading statements made on information and belief.") (internal quotation marks omitted); <u>In re Cabletron Sys., Inc.</u>, 311 F.3d at 29 ("The approach we take, similar to <u>Novak</u>, is to look at all of the facts alleged to see if they provide an adequate basis for believing that the defendants' statements were false.") (internal quotation marks omitted); <u>In re Theragenics Sec. Litig.</u>, 105 F. Supp. 2d at 1355 (adopting the approach used in <u>Novak</u>).

We adopt an approach similar to the Second Circuit's in <u>Novak</u> of evaluating the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading. Such an approach will involve an evaluation of (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading. <u>See</u> <u>In re Cabletron Sys., Inc.</u>, 311 F.3d at 29–30. If, measuring the nature of the facts alleged against these indicia, a reasonable person would believe that the defendant's statements were false or misleading, the

plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements. We adopt this approach because it "strikes the balance Congress intended in the PSLRA. The statute was designed to erect barriers to frivolous strike suits, but not to make meritorious claims impossible to bring." Id. at 30. Requiring plaintiffs to state with particularity facts that support a reasonable belief in the misleading nature of a defendant's statements creates a significant hurdle for plaintiffs to overcome before discovery, but it permits plaintiffs with valid claims to proceed with their lawsuits.

The defendants argue for a more rigorous particularity standard, contending that in addition to stating specific facts in support of their allegations, plaintiffs also must disclose the sources from which the plaintiff obtained knowledge of those facts. We acknowledge that there are cases containing language indicating that plaintiffs must state sources from which they learned the facts asserted in a complaint made upon information and belief. The First Circuit, for example, has taken the position that when "the plaintiff brings his claim on information and belief, he must set forth the source of the information and the reasons for the belief." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) (internal quotation marks omitted); see also In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746, 763–64 (N.D. Cal. 1997) (holding that to plead with particularity

plaintiffs "'must literally, in [their] pleadings, include the names of confidential informants, employees, competitors, Government employees, members of the media, and others who have provided information leading to the filing of the case'") (quoting 141 Cong. Rec. H2849 (Mar. 8, 1995) (statement of Rep. Dingell)), aff'd 183 F.3d 970, 983–84 (9th Cir. 1999).

Other courts have taken a more moderate approach, suggesting that personal sources do not have to be disclosed so long as the key allegations are supported by documentary evidence. The lead decision in this line of cases is Novak from the Second Circuit. 216 F.3d at 312–14. Adopting and explaining the multi-step analysis that Novak established to determine what sources a plaintiff must disclose, the Fifth Circuit has written:

> [W]e see no reason to embroider the multi-step analysis of the Second Circuit and accept it as stated:
> (1) if plaintiffs rely on confidential personal sources and other facts, their sources need not be named in the complaint so long as the other facts, i.e., documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading;
> (2) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief;
> (3) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or

- 34 -

omissions were false <u>and</u> the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

<u>ABC Arbitrage Plaintiffs Group</u>, 291 F.3d at 353 (footnote omitted); <u>see also</u> <u>Johnson v. Tellabs, Inc.</u>, 262 F. Supp. 2d 937, 946 (N.D. Ill. 2003) ("This Court agrees with the Second Circuit's approach in <u>Novak</u>."); <u>In re ATI Techs., Inc. Sec. Litig.</u>, 216 F. Supp. 2d 418, 432 (E.D. Pa. 2002) (adopting <u>Novak</u> approach); <u>In re Theragenics Sec. Litig.</u>, 105 F. Supp. 2d at 1355 (same).  According to the approach used by these courts, the facts alleged by a plaintiff can come from either of two sources—people or documents—and the complaint must specifically refer to one of them.  Thus, the court in <u>Novak</u> said, "a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs."  216 F.3d at 314; <u>see also</u> <u>ABC Arbitrage Plaintiffs Group</u>, 291 F.3d at 354 n.83 ("[D]ocumentary evidence may be pleaded as the source or factual basis for the plaintiff's belief underlying his allegations.").

For several reasons, we do not adopt the position that the particularity requirement of § 78u-4(b)(1) establishes a per se rule that a plaintiff's complaint must always identify the source, either personal or documentary, of the facts alleged.  First, the text of § 78u-4(b)(1) does not impose such a requirement.

Section 78u-4(b)(1) requires only that the pleader state with particularity all "facts" upon which belief is formed, and it is not required that the pleader always state the source of those facts. Indeed, the Second Circuit in Novak acknowledged this when it stated: "[T]he applicable provision of the law . . . requires plaintiffs to plead only facts and makes no mention of the sources of these facts." 216 F.3d at 313; see also, In re Digi Int'l, Inc., Sec. Litig., 6 F. Supp. 2d 1089, 1096–97 (D. Minn. 1998) ("[T]he Court declines to adopt the view that the language of the Reform Act mandates that each and every 'information and belief' allegation must be supported by underlying documentary evidence."), aff'd 2001 WL 753869 (8th Cir. 2001). Judicial gloss requiring the allegation of the sources, either documentary or personal, of all facts alleged is in our view too restrictive a response to the requirement of pleading facts with particularity.

Second, requiring plaintiffs to identify the source of the facts they allege is to require, in effect, that the plaintiffs plead their evidence in their complaint. See, e.g., Novak, 216 F.3d at 314 ("[A] complaint can meet the new pleading requirement . . . by providing documentary evidence."); ABC Arbitrage Plaintiffs Group, 291 F.3d at 353 (same). The PSLRA did not, however, purport to move up the trial to the pleadings stage. While the PSLRA certainly heightened pleading standards for securities fraud lawsuits, we believe that if Congress had

intended in securities fraud lawsuits to abolish the concept of notice pleading that underlies the Federal Rules of Civil Procedure, Congress would have done so explicitly. "Clearly, the Reform Act requires some precision in alleging facts, however, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim." In re Cephalon Sec. Litig., No. Civ. A. 96-CV-0633, 1997 WL 570918, at *2 (E.D. Pa. Aug. 29, 1997); Paraschos v. YBM Magnex Int'l, Inc., No. CIV A 98-6444, 2000 WL 325945, at *8 (E.D. Pa. Mar. 29, 2000) (same); In re First Merchants Acceptance Corp. Sec. Litig., No. 97-C-2715, 1998 WL 781118, at *7 n.3 (N.D. Ill. Nov. 4, 1998) ("The complaint sets forth detailed allegations of fraud and alleges substantially more than 'rumor or hunch.' The fact that Plaintiffs do not have all of the specific documents to support their claims at this time is not fatal to their complaint.") (citations omitted).

Third, requiring plaintiffs to identify the personal or documentary sources of the facts they allege in an "information and belief" complaint is not always necessary to further the object of the heightened pleading standards under the PSLRA. The purpose of § 78u-4(b)(1) is to afford a defendant fair notice of a plaintiff's claims and the factual ground upon which they are based. Novak, 216 F.3d at 314; In re Theragenics, 105 F. Supp. 2d at 1348–49. Defendants in securities fraud lawsuits do not require, for example, the name of the employee

who provided plaintiffs with facts, or the title of the internal report relied upon by the plaintiffs, so long as the facts alleged in the plaintiffs' complaint are detailed enough to support a reasonable belief that the defendant's statements identified by the plaintiffs were false or misleading. The level of factual specificity required to meet this standard may put defendants on notice of precisely what they are alleged to have done wrong and permit them to defend against the charge.

Although we disagree with cases like <u>Novak</u> and <u>ABC Arbitrage Plaintiffs Group</u> to the extent they <u>require</u> plaintiffs to disclose either personal or documentary sources for the key allegations in an information and belief complaint, we agree with their general sentiment that by disclosing such sources plaintiffs can significantly strengthen their pleading. In pleading the misleading nature of a defendant's statements, the support provided by source information will often be helpful in distinguishing whether a particular allegation is mere rumor and speculation or whether it is based on concrete information from relevant documents or people who were in a position to know the truth of the allegations. Thus, depending on the generality of the allegation, it may or may not be necessary to plead the source of the information in order to satisfy the particularity requirement of § 78u-4(b)(1) in an information and belief complaint.

For example, facts that are difficult to verify, such as allegations of secret meetings, the content of private conversations, or alleged motivations, may be

sufficiently ambiguous or indistinct so that disclosure of source information is required before they lend measurable support to a reasonable belief in the misleading nature of a defendant's statements. Little weight would be accorded to a plaintiff's allegations that, for instance, simply stated that an unidentified employee working for the defendant believed that a certain corporate profit statement was misleading. By contrast, such an allegation would carry more weight if the complaint identified the name or title of a person working for the chief financial officer who participated in the preparation of the company's financial reports and who claimed to know that a certain financial statement was misleading.

On the other hand, other allegations may be objectively verifiable by the defendant without the necessity of the plaintiff divulging how he or she acquired such information. Examples may include allegations of specific contract terms, the financial result of a transaction, or specific prevailing market conditions. Allegations of facts such as these ordinarily will not require the plaintiff to disclose how he or she learned such information before a court may give weight to the substantive allegations of fraud.

In sum, in this Circuit we will apply a common-sense, case-by-case approach in determining whether a plaintiff has alleged securities fraud with the particularity required by § 78u-4(b)(1) without adding a per se judicial

requirement that the source of facts must always be alleged to support substantive allegations of fraud in an information and belief complaint. In deciding whether the factual allegations support a reasonable belief that fraud occurred, courts should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations; whether the allegations are specific enough to be verified or refuted by a defendant without requiring the complaint to disclose how the plaintiff learned of such facts or experts to prove such facts at trial; whether the sources of the facts are disclosed and the reliability of those sources; and any other factors that might affect how strongly the facts alleged support a reasonable belief that the defendant's statements were false or misleading. To meet the standard, plaintiffs are not required to disclose the documentary or personal sources from which they learned the facts alleged in an information and belief complaint. We emphasize, however, that the PSLRA did heighten the standard for pleading securities fraud, and where a plaintiff does not identify the sources of the facts stated in the complaint, the facts alleged in an information and belief complaint will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading.

d.) <u>Applying the Standard for Pleadings Made on Information and Belief</u>

After reviewing the factual statements made in the complaint, we find that they support a reasonable belief that Kinder-Morgan's reported net income, Bushton's reported operating income, and statements that the Bushton Plant contributed positively to earnings were all false or misleading. "Overall, the accumulated amount of detail the [complaint] provides tends to be self-verifying; these are not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred . . . ." <u>In re Cabletron Sys., Inc.</u>, 311 F.3d at 30.

The allegation that Bushton was losing money was supported by two sets of facts in the complaint. The first set of facts showed that Bushton was, in fact, unprofitable. Included in this set of facts is the information from Rose Robeson, the Assistant Treasurer, that her analysis of the Bushton Plant before it was acquired determined that the Plant would be unprofitable, and that after Kinder-Morgan acquired Bushton, defendant McKenzie and Kinder-Morgan vice president John DiNardo frequently complained to Robeson during the third quarter of 1997 about the losses being incurred by the Bushton Plant. Also included in this set of facts is the employee meeting that DiNardo held in the Spring of 1998, in which he addressed the problems at Bushton and told the employees that the Plant was losing money at a rate of $700,000 per month.

- 41 -

Finally, there is a report from an industry publication identified and quoted in the complaint which stated that with its large lease payment, Bushton became "a perpetual money-loser whose cashflow rarely covers the lease payment, much less generating a profit."

The second set of facts supporting the allegation that Bushton was unprofitable is the detailed explanation in the complaint of *why* Bushton was unprofitable. In nine paragraphs of the complaint, the plaintiffs explained how the large lease payment on the Bushton Plant and unfavorable market conditions affecting "keep whole" contracts caused Bushton to lose money. With respect to the keep whole contracts the complaint not only explained how the terms of the contracts made them unprofitable during market conditions prevailing during the relevant period, but it explains what the market conditions were and what they would have to have been for Kinder-Morgan to have broken even on those contracts.

This level of detail about why Bushton was unprofitable is significant. Far from resting on conclusory assertions about the state of the Bushton operation, the plaintiffs have articulated a plausible explanation for their allegations, based on objectively verifiable market data, sources who were inside the company, and statements by industry observers made to a trade publication. We conclude that the plaintiffs have stated sufficient facts to support a reasonable belief that it was

false or misleading for Kinder-Morgan to state that the Bushton Plant positively impacted the Company's earnings.

The facts alleged in the complaint also support the allegations that the Company's reports of net income and Bushton operating income statement during the relevant period were false or misleading. The facts discussed above about the condition of the Bushton operation bolster this conclusion. Because it is reasonable to believe that it was false or misleading for Kinder-Morgan to claim that Bushton was adding to net income, then it is also reasonable to believe that the $5.1 million operating income figure for Bushton that Kinder-Morgan reported in its 1997 third quarter 10-Q filing was also false or misleading. Furthermore, because it is reasonable to believe that the Bushton Plant did not contribute the $5.1 million in operating profits stated in the 10-Q filing, then it is also reasonable to believe that the total profits reported by Kinder-Morgan were overstated by at least the amount the Company claimed Bushton contributed to the bottom line.

There are additional facts that support a reasonable belief that Kinder-Morgan's net income was overstated during the relevant period. The complaint identifies three contracts related to the Bushton Plant that, it is alleged, were reduced to their present value during the third quarter of 1997 and recorded as income at the Bushton Plant in violation of GAAP and the Company's own

income recognition policy. Again, the complaint provides significant detail about these contracts. It discloses not just the existence of the contracts, but also their terms and the identities of the parties to them.

The complaint also discloses significant details about another transaction alleged to have violated GAAP. The transaction between Kinder-Morgan and Enron involving a dummy entity called Red Rock LLC that, according to the complaint, permitted Kinder-Morgan to realize the income on its CU Cogen contract several years before it could have done so under GAAP. The complaint specifies the precise amount involved, $6 million, and explains how receipt of this amount from Enron inflated Kinder-Morgan's 1998 first quarter net income by 27%. In light of the Company's statement that it adhered to GAAP in preparing its financial statements, the details of this transaction support a reasonable belief that Kinder-Morgan's net income report for the first quarter of 1998 was false and misleading.[4]

Finally, we note that the complaint also alleges that the defendants possessed motives to engage in fraud, such as the desire of the Company to sell

---

[4] We note that it would not have satisfied our standard if the complaint had merely alleged generally that the defendants had violated GAAP in support of its allegations that the Company's profit reports were false or misleading. The critical facts alleged by the plaintiffs in this case are the identification of the specific transactions alleged to have violated GAAP and the amount of detail provided in explaining those transactions.

its securities at favorable prices and to close a merger transaction with Sempra Energy. This is the type of factual allegation that would be bolstered if the plaintiffs could disclose a reliable source which one might expect to have knowledge of the defendants' actual motives. Because there is nothing in the allegations of the defendants' motives to indicate they are anything more than pure speculation, we do not accord much weight to these allegations in our analysis.

Nevertheless, we conclude that the complaint produced by the plaintiffs, when considered as a whole, is not based on conclusory assertions. Although based on information and belief, it alleges sufficient "facts on which that belief is formed" to satisfy the pleading requirement of § 78u-4(b)(1). It adequately puts the defendants on notice of the substance of the plaintiffs' claims, and the range, sources, and level of detail of the facts alleged demonstrate that this complaint is not frivolous or conclusory and deserves to proceed to the next stage of litigation.

2.      Pleading Scienter Under the PSLRA

Having concluded that the complaint satisfies the pleading requirements of § 78u-4(b)(1), we now turn to whether it satisfies the PSLRA's heightened standard in § 78u-4(b)(2) for pleading the element of scienter. In a securities fraud case, the appropriate level of scienter is "a mental state embracing intent to deceive, manipulate, or defraud," or recklessness. Fleming Cos., 264 F.3d at

1259. Section 78u-4(b)(2) states that the complaint shall "state with particularity facts giving rise to a strong inference that the defendant acted with . . . [scienter]." We have interpreted this provision to mean that "[w]hen reviewing a plaintiff's allegations of scienter under the PSLRA, a court should . . . examine the plaintiff's allegations in their entirety . . . and determine whether the plaintiff's allegations, taken as a whole, give rise to a strong inference of scienter." Fleming Cos., 264 F.3d at 1263.

An inference is a logical conclusion drawn from the facts. See, e.g., Webster's Third New International Dictionary 1158 (1986) (defining "inference" as "the act of passing from one or more propositions . . . considered as true to another the truth of which is believed to follow from that of the former"). We therefore understand a "strong inference" of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading.

We consider first the allegations of scienter as to Clyde McKenzie, who was Kinder-Morgan's chief financial officer during the class period. We conclude that the complaint adequately pleads scienter as to him. As discussed in detail in Part II.B.1, supra, the complaint pleads a number of facts supporting the conclusion that the Bushton Plant was unprofitable. Two of those facts are that Rose Robeson told McKenzie before Kinder-Morgan acquired Bushton that it

- 46 -

would be unprofitable, and that McKenzie frequently came to Robeson's office during the third quarter of 1997 to complain about the fact that Bushton was losing money. These are particularized facts that establish a strong inference that McKenzie acted with intent to deceive when he signed the company's financial statements declaring that the Bushton Plant positively impacted earnings.

These facts also establish that McKenzie acted with intent to deceive when he signed financial filings with the SEC during the class period stating Bushton's operating income and the Company's net income. Reinforcing that conclusion are the allegations about the decision, in contravention of GAAP and the company's own accounting policies, to accelerate the recognition of income from the three Bushton contracts and the CU Cogen contract. An allegation of GAAP violations or accounting irregularities standing alone does not give rise to a strong inference of scienter. Fleming Cos., 264 F.3d at 1261. Here, however, the alleged GAAP violations come on top of other particularized facts indicating that a key operation of the company was losing money, McKenize knew that fact, and he falsely reported a profit for it. The alleged GAAP violations in this case strengthen the inference that McKenzie signed financial statements with intent to deceive, particularly in light of the detail with which the alleged GAAP violations are stated, the fact that McKenize was Kinder-Morgan's chief financial officer, and

the fact that the Company's financial reports declared that Kinder-Morgan's financial statements were prepared in accordance with GAAP.

We also conclude that the allegations in the complaint, considered as a whole, give rise to a strong inference that Larry Hall acted with intent to deceive when he signed Kinder-Morgan's financial statements during the class period. We begin by noting that Hall was the president and chief executive officer of Kinder-Morgan during the class period. We have held that, standing alone, the fact that a defendant was a senior executive in a company cannot give rise to a strong inference of scienter. Fleming Cos., 264 F.3d at 1263–64. However, that Hall was the most senior executive of the Company is a fact relevant in our weighing of the totality of the allegations.

Several other facts, when considered in conjunction with Hall's position as president and chief executive officer, give rise to a strong inference that he acted with scienter. First, we have already determined that the complaint alleges with sufficient particularity that Hall's chief financial officer knew of the false statements in the Company's financial reports. Typically, the chief financial officer is second only to the chief executive officer in the management of a corporation's financial affairs. The fact that McKenzie knew of the false statements is an important link in the inferential chain between Hall's position as president and chief executive officer and the conclusion that Hall knew of the

- 48 -

false statements. Because McKenzie was Hall's chief financial officer, the fact that McKenzie was aware that the financial statements were false reduces the likelihood that Hall was ignorant of that fact.

Strengthening the inference that Hall knew of the statements was the magnitude of the alleged falsity. In the first quarter of 1998, the complaint alleges that the accelerated recognition of income from the CU Cogen contract added $6 million to the Company's reported net income. This represented more than one quarter of the $22.4 million in net income reported by the Company that quarter. It is reasonable to infer that such a substantial contribution to earnings from the CU Cogen contract would be known by the president and chief executive officer. Moreover, the likelihood that Hall knew of the circumstances under which Kinder-Morgan recognized the CU Cogen income on an accelerated basis is increased by the fact that Arthur Andersen, Kinder-Morgan's outside auditor at the time, challenged the transaction. Thus, we conclude that a strong inference arises that Hall acted with scienter when he signed the financial reports covering the 1998 fiscal year.

Because the complaint adequately alleges that Hall, the president and chief executive officer of Kinder-Morgan, and McKenzie, the chief financial officer of Kinder-Morgan, had the scienter to defraud, those allegations are also sufficient to allege scienter to defraud on behalf of Kinder-Morgan itself. The scienter of

the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority. Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 100–01 (2d Cir. 2001) (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b-5); Cromer Finance Ltd. v. Berger, Nos. 00 Civ. 2284 (DLC) & 00 Civ. 2498 (DLC), WL 826847, at *7–8 (S.D.N.Y. May 2, 2002) (holding that scienter of partner of accounting firm could be imputed to the firm itself under traditional agency principles); In re JDN Realty Corp. Sec. Litig., 182 F. Supp. 2d 1230, 1246 (N.D. Ga. 2002) (holding that scienter of chief executive officer of defendant corporation was attributable to the corporation); 2 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 12.8[4], at 444 (4th ed. 2002) ("[K]nowledge of a corporate officer or agent acting within the scope of authority is attributable to the corporation."); cf. Kerbs v. Fall River Indus., 502 F.2d 731, 741 (10th Cir. 1974) (holding defendant corporation liable for securities fraud "because . . its president, acting within the scope of his apparent authority as principal officer and agent of the corporation, engaged in conduct which violated provisions of § 10 of the Act and Rule 10b-5"), abrogated on other grounds by Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 191

(1994) (holding that § 10(b) of the Act does not support claims by private plaintiffs of aiding and abetting liability).

Finally, we conclude that the complaint fails to provide sufficient particularized facts that give rise to a strong inference that Larry Kinder, a Kinder-Morgan board member during the class period, knew that the statements about Bushton's profitability were false, or that the Company's financial statements were false. For example, the plaintiffs allege that "senior management" attended meetings at the end of each month to identify improper transactions that could be booked to boost reported earnings and mask operational problems. No specific allegation is made that Kinder attended these meetings. Conclusory allegation about the involvement of "senior management" does not amount to a particularized claim that Kinder—who was a director not a manager—knew about the false statements. The plaintiffs' allegations with respect to Kinder are nothing more than "generalized imputations of knowledge" and are not sufficient to establish scienter. Fleming Cos., 264 F.3d at 1264.

We hold that the plaintiffs' complaint satisfies the pleading standards of the PSLRA as to all of the defendants except for Kinder. As to Kinder, the complaint fails to adequately plead scienter and we affirm the dismissal of the cause of action for primary violations of § 10(b) of the Act and Rule 10b-5 as against him.

## C. Control Person Liability

Section 20(a) of the Securities Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Interpreting the provision, we have explained that "[t]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." Fleming, 264 F.3d at 1270–71 (citing Maher v. Durango Metals, Inc., 144 F.3d 1302 (10th Cir. 1998)). The district court dismissed the plaintiffs' claims against the individual defendants for controlling person liability under Section 20(a) of the Act, 15 U.S.C. § 78t, because the district court had concluded that the plaintiffs had not adequately pled primary claims that Kinder-Morgan violated § 10(b) of the Exchange Act and Rule 10b-5.

With respect to the first element of the prima facie case, we have already concluded that the plaintiffs have successfully pled primary violations of the securities laws by Kinder-Morgan. Therefore, the plaintiffs have satisfied the first requirement in pleading a claim of control person liability.

The second element of the prima facie case requires that the plaintiffs plead facts from which it can be reasonably be inferred that the individual defendants

- 52 -

were control persons. <u>Maher</u>, 144 F.3d at 1306. To make this showing, the plaintiffs must point to facts which indicate that the defendants had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." <u>Id.</u> at 1305.

We first conclude that the plaintiffs have failed to allege sufficient facts to support the conclusion that Kinder was a control person. During the period in question, he was not an executive of the company, but simply a member of the board of directors. The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act. <u>See, e.g.</u>, <u>Dennis v. General Imaging, Inc.</u>, 918 F.2d 496, 509–10 (5th Cir. 1990) (holding that status as a director will not make someone a controlling person absent "evidence [the alleged controlling person] was able to influence the firm's direction"); <u>Burgess v. Premier Corp.</u>, 727 F.2d 826, 832 (9th Cir. 1984) ("A director is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed."); <u>Cameron v. Outdoor Resorts of Am., Inc.</u>, 608 F.2d 187, 195 (5th Cir.

1980) ("As a director without effective day-to-day control and without knowledge [the defendant] was not liable as a control person."). Accordingly, the district court was correct to dismiss the claim of control person liability against Kinder.

Second, we conclude that the plaintiffs have pled facts supporting the allegation that Hall was a control person. He was the Chairman, President, and CEO of Kinder-Morgan during the relevant period. As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis. There were no managers higher than Hall. He thus clearly possessed "the power to direct or cause the direction of the management and policies of [Kinder-Morgan]." Maher, 144 F.3d at 1305; see also In re Ribozyme Pharmaceuticals, Inc. Sec. Litig., 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000) (holding that plaintiffs adequately pled that defendant was a control person when they asserted he was the CEO, President, and a director of the company during the relevant period). Hall also had direct control over McKenzie, his chief financial officer and an alleged primary violator of Rule 10b-5. Maher, 144 F.3d at 1305.

Hall argues that even if he is a control person, he should not be subject to control person liability because the plaintiffs have not pled facts suggesting that he was a culpable participant in a fraud. It is true, as Hall argues, that some courts require evidence that a control person was a participant in the fraudulent activity. See, e.g., In re Cendant Corp. Sec. Litig., 76 F. Supp.2d 539, 548

(D.N.J. 1999). However, we have "expressly rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation." Maher, 144 F.3d at 1305.

Hall attempts to overcome this clear language by arguing that our "decisions did not rely on or fully consider the relationship of the increased pleading requirements in the PSLRA with the requirements to establish controlling person liability under Section 20(a)." He says that our rulings conflict with the PSLRA's requirement that "with respect to each act or omission alleged to violate this chapter, [plaintiffs] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Aple. Hall's B. at 33 (quoting 15 U.S.C. § 78u-4(b)(2)). But Hall imagines a conflict where there is none. The section of the PSLRA that he cites—§ 79u-4(b)(2)—applies only to a "private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind . . . ." 15 U.S.C. § 79u-4(b)(2) (emphasis added). Section 20 of the Exchange Act contains no requirement that plaintiffs must prove

a control person's state of mind.[5] Hall's argument that we should overrule our precedent is unpersuasive.

Finally, we turn to defendant McKenzie, who was a vice president and the chief financial officer of Kinder-Morgan during the relevant period. In support of their contention that he was a control person, the plaintiffs merely refer to his position within the company. In other circumstances, this would not likely be enough satisfactorily to allege control. In the present case, however, the two identified, actionable claims of securities fraud relate specifically to official reports of the company's financial performance. As Kinder-Morgan's chief financial officer, it is reasonable to infer that McKenzie had at least indirect control over the KM's financial reporting. We conclude that under the circumstances of this case, the plaintiffs adequately pled facts indicating that McKenzie had direct or indirect control over the alleged fraudulent activity because he was the chief financial officer.

---

[5] Section 20 does state that a controlling person is not liable if he acted in good faith and did not induce the acts on which the liability of the controlled person is founded. However, courts have held that these are affirmative defenses, to be pleaded and proved by defendants. See, e.g., Kaplan v. Rose, 49 F.3d 1363, 1382–83 (9th Cir. 1994); Gould v. Am.-Haw. S.S. Co., 535 F.2d 761, 779 (3d Cir. 1976).

In sum, the district court was correct to dismiss the claim of control person liability against Kinder, but erred in dismissing that claim against Hall and McKenzie.

### III. CONCLUSION

We conclude that the second amended complaint pled facts with particularity sufficient to satisfy 15 U.S.C. § 78u-4(b)(1)'s special pleading standard for securities fraud allegations made on information and belief. We conclude, however, that the complaint adequately pleads scienter under § 78u-4(b)(2) only as to defendants Hall, McKenzie, and Kinder-Morgan. We also conclude that the complaint adequately pleads control person liability under 15 U.S.C. § 78t(a) as to Hall and McKenzie, but not as to Kinder. Therefore, we REVERSE the dismissal of the complaint as to defendants Hall, McKenzie, and Kinder-Morgan. We AFFIRM the dismissal of the complaint as to Kinder.