**PUBLISH**

**UNITED STATES COURT OF APPEALS**

August 2, 2019

**FOR THE TENTH CIRCUIT**

_____

VANESSA BENAVIDEZ; STELLA
PADILLA,

     Plaintiffs - Appellants,

v.

NATALIE HOWARD, Albuquerque
City Clerk; JESSICA MARIE
HERNANDEZ, City Attorney;
WILLIAM ZARR, Assistant City
Attorney; NICHOLAS BULLOCK,
Assistant City Attorney,

     Defendants - Appellees.

No. 18-2027

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:17-CV-00966-WJ-LF)**

_____

A. Blair Dunn, Esq., Western Agriculture, Resource and Business
Advocates, LLP, Albuquerque, New Mexico, for Plaintiffs-Appellants.

Jerry A. Walz (James J. Grubel with him on the brief), Walz and
Associates, P.C., Albuquerque, New Mexico, for Defendants-Appellees.

_____

Before **BACHARACH**, **BALDOCK**, and **EBEL**, Circuit Judges.

_____

**PER CURIAM.**

_____

Vanessa Benavidez and Stella Padilla contend that Defendants violated their First Amendment rights by filing a motion in a civil case. The district court dismissed their complaint. For the following reasons, we affirm.

## I.    Background

Because Stella Padilla's nominating petition for Albuquerque mayor lacked the required number of valid signatures, the Albuquerque City Clerk, Natalie Howard, rejected her request to appear on the ballot as a candidate in the city's 2017 mayoral election. Padilla promptly sued Howard in her official capacity in state court for a declaration that she had satisfied the nominating petition requirements to be a candidate for mayor. *Padilla v. Howard*, No. D-202-CV-2017-03556 (Bernalillo Co., NM, filed May 19, 2017).

Less than a month later, Howard, represented by the city attorney's office in the state action, filed a "Motion for a Protective Order Against Harassment of the Defendant by any Volunteer or Other Person Associated with Plaintiff's Campaign Organization." Attached to Howard's motion was her "Affidavit in Support of Motion for Protective Order." In her affidavit, Howard complained specifically about harassing conduct that Padilla's daughter, Vanessa Benavidez, had exhibited toward her on two recent occasions.

2

A week later, Howard filed a motion to dismiss Padilla's complaint for failure to state a claim. Without comment and with Howard's motion for a protective order still pending, the state district court dismissed Padilla's complaint with prejudice on July 7, 2017. Rather than pursuing a direct appeal of the state court's ruling, Padilla unsuccessfully sought a Writ of Superintending Control from the New Mexico Supreme Court. *See* N.M. Const. art. VI, § 3 ("[T]he supreme court . . . shall have a superintending control over all inferior courts[.]").

Padilla and Benavidez then filed this collateral § 1983 action for damages in federal district court on September 21, 2017. Plaintiffs' complaint asserts that Howard's motion for a protective order in the state action chilled their free speech rights and effectively sought, through a "vindictive prosecution," to prevent them from exercising their rights to petition the state court for redress. Plaintiffs sued not only Howard in her official capacity, but also the city attorney, Jessica Hernandez, and the two assistant city attorneys assigned to represent Howard in the state action, William Zarr and Nicholas Bullock.

The four corners of the complaint are woefully short on the facts giving rise to Plaintiffs' claims. The complaint alleges little more than that Defendants, "acting in concert," filed a motion for a protective order inconsistent with New Mexico law "without justification and cause, solely to harass Plaintiffs and prevent the continued criticism of the City of

3

Albuquerque employees and to deny Plaintiffs the right to petition their government for redress."

Attached to Plaintiffs' complaint, however, is a copy of Howard's motion for a protective order and her sworn affidavit in support thereof.[1] Howard's unrebutted affidavit states that on May 19, 2017, Benavidez served her with Padilla's state court complaint in the public area of the city clerk's office on the seventh floor of Albuquerque's Plaza del Sol building. But then Benavidez erroneously insisted that Howard sign the affidavit of service. Howard refused and walked toward the door leading into the private secured area of her office. Benavidez yelled at Howard and told her she could not leave until she signed the affidavit. Howard attests: "I continued to the secured area, and, as the door was closing, [Benavidez] pushed the door open and entered into the non-public area of the clerk's office. [Benavidez] followed me into the secured area, stood approximately 12 inches away from me and continued to insist that I sign the affidavit." Benavidez left the secured area only after Howard directed staff to contact security. Moments later, Howard departed her seventh-floor office with a staff member and security officer to attend a meeting outside the building.

---

[1] Because these two attachments, Howard's motion for a protective order and accompanying affidavit, are central to Plaintiffs' claims and the authenticity of the state court documents is undisputed, we may consider them as part of Plaintiffs' federal complaint. *See Hampton v. Root9B Tech.*, 897 F.3d 1291, 1297 (10th Cir. 2018).

4

When the elevator reached the seventh floor and its door opened, Benavidez was standing alone in the elevator. Benavidez remained in the elevator for the ride down, all the while staring at Howard.

Howard further attests that on June 5, 2017, she was preparing to attend a hearing in Padilla's state action when Benavidez again confronted her, this time on the steps of the Bernalillo County Courthouse. Benavidez approached Howard at the top of the steps carrying a "Stella for Mayor" sign. Benavidez "positioned herself approximately six inches away from me while yelling at me about the case. She proceeded to walk backward directly in front of me, with the 'Stella for Mayor' sign in front of my face, blocking my path. I felt [Benavidez] was attempting to intimidate me." When Howard told Benavidez to stop harassing her, Benavidez replied: "'You don't know what harassment is.'" Howard concluded her affidavit by stating that Benavidez's "pattern of conduct" had caused Howard to become "reasonably concerned" for her physical safety.

## II.   District Court's Ruling

Upon motion and after a hearing during which the district court expressed legitimate reservations about numerous aspects of Plaintiffs' federal complaint, the court entered a written order dismissing the case. *Benavidez v. Howard*, No. 17-966, 2018 WL 565706 (D.N.M. Jan. 24, 2018) (unpublished). The court held that all Defendants were absolutely

5

immune from Plaintiffs' § 1983 action.[2] The court ruled that the named

Defendants from the city attorney's office were immune because in

submitting the motion for a protective order to the state court they were

participating as advocates in the judicial process: "They did so as part of

their duty in defending City Clerk Natalie Howard against a state court

lawsuit which Plaintiff Stella Padilla initiated, and their objective in taking

that action was one of advocacy, which earmarks it for the protections of

absolute immunity." *Id.* at \*5. The court reasoned that the filing of the

motion for a protective order "belongs in the category of actions that are

associated with the judicial process rather than those that are investigative

or administrative in nature." *Id.*

Meanwhile, the district court held that Defendant Howard, the city

clerk, was entitled to absolute immunity because Plaintiffs' constitutional

claims arose out of a motion based on a sworn affidavit that she presented

to the state court in a pending lawsuit. The district court explained that the

---

[2]     In the alternative, the district court held all Defendants were entitled
to qualified immunity because Plaintiffs' complaint failed to state a cause
of action under the First Amendment. Observing that the complaint did not
challenge the factual statements contained in Howard's affidavit, the court
opined that the unrebutted facts attested to in the affidavit suggest
Benavidez sought to harass and intimidate Howard rather than simply
exercise her First Amendment rights: "Defendants are correct in that there
is no First Amendment right to harass or intimidate government officials,
and so Ms. Benavidez' conduct as described in Ms. Howard's affidavit
does not . . . constitute protected conduct in a First Amendment analysis."
*Benavidez*, 2018 WL 565706, at \*7.

absolute immunity enjoyed by witnesses in judicial proceedings extends to witnesses presenting testimony by way of affidavit. Howard's attorneys filed the motion for a protective order on her behalf "and it was her sworn description of the events that transpired—that is, her *testimony*—that formed the basis for the requested protective order." *Id.* at *6 (emphasis in original).

## III.  City Attorney and Assistant City Attorneys

We need not tarry long in disposing of this appeal from the district court's final judgment in favor of Defendants Hernandez, Zarr, and Bullock. *See* 28 U.S.C. § 1291. Setting aside the obvious and multiple facial deficiencies in Plaintiffs' § 1983 complaint, we first address the city attorney and assistant city attorney's threshold defense of absolute immunity as a complete bar to Plaintiffs' suit. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976) ("An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of immunity."). Our review is de novo. *Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000). Public officials who seek absolute immunity, i.e., an absolute exemption from personal liability for allegedly unconstitutional conduct, bear the burden of showing that public policy requires an exemption of such broad scope. *Butz v. Economou*, 438 U.S. 478, 506 (1978).

The Supreme Court has explained on multiple occasions that Congress did not intend § 1983 to abrogate immunities recognized at

7

common law by way of "history and reason." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). "[A]lthough 'the precise contours of official immunity' need not mirror the immunity at common law, we look to the common law and other history for guidance . . . to discern Congress' likely intent in enacting § 1983." *Burns v. Reed*, 500 U.S. 478, 493 (1991) (citation omitted). "In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity," we apply a "'functional approach,' which looks to 'the nature of the function performed, not the identity of the actor who performed it.'" *Buckley*, 509 U.S. at 268 (citation omitted); *see also id.* at 282 (Kennedy, J., concurring in part) (citing cases). In other words, our approach concentrates "on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful." *Id.* at 271.

Where a public official participating in the judicial process is sued in collateral proceedings, our focus on the effective functioning of our justice system does not arise from a generalized concern about interfering with the official's duties. Rather, our focus arises from a specific concern about interfering with "conduct closely related to the judicial process." *Burns*, 500 U.S. at 493.

The Supreme Court has interpreted § 1983 to provide absolute immunity for the performance of certain functions "because any lesser

degree of immunity could impair the judicial process itself." *Malley v. Briggs*, 475 U.S. 335, 342 (1986). Where providing only qualified immunity would fail to ensure the unhindered performance of a public official's duties essential to the proper functioning of that process, a grant of absolute immunity is proper. *Imbler*, 424 U.S. at 427–28 (emphasis added). Today, "[f]unctions that serve as an 'integral part of the judicial process' or that are 'intimately associated with the judicial process' are absolutely immune from civil suits." *Rogers v. O'Donnell*, 737 F.3d 1026, 1031 (6th Cir. 2013) (quoting *Imbler*, 424 U.S. at 430). "[O]urs is a 'continuum based approach' and the 'more distant a function is from the judicial process, the less likely absolute immunity will attach.'" *Mink v. Suthers*, 482 F.3d 1244, 1261 (10th Cir. 2007).

* * *

Consistent with our functional approach to absolute immunity, such immunity may extend to various participants in a judicial proceeding, including government attorneys. In 1976, the Supreme Court first recognized a prosecuting attorney's entitlement to absolute immunity in a § 1983 suit. *Imbler*, 424 U.S. at 410. Two years later, the Court held that "an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence." *Butz*, 438 U.S. at 517.

9

Relying on the Court's reasoning in *Imbler* and *Butz*, our sister circuits have held that absolute immunity also is available to attorneys defending the government in civil litigation because such immunity is necessary to achieve the independent judgment and vigorous advocacy vital to the effective functioning of our adversarial system of justice. *See, e.g.*, *Auriemma v. Montgomery*, 860 F.2d 273, 276 (7th Cir. 1988); *Murphy v. Morris*, 849 F.2d 1101, 1105 (8th Cir. 1988); *Barrett v. United States*, 798 F.2d 565, 572 (2d Cir. 1986). We subsequently recognized absolute immunity as extending to "government lawyers involved in civil proceedings." *Robinson v. Volkswagenwerk*, 940 F.2d 1369, 1373 n.4 (10th Cir. 1991); *see also Scott*, 216 F.3d at 908–10 (holding a county attorney had absolute immunity from a § 1983 claim arising out of a civil commitment proceeding).

Paraphrasing *Buckley*, the rule of absolute immunity as applied to government attorneys charged with violating § 1983 may be stated generally as follows: A government attorney's administrative duties and those investigatory functions that do not closely relate to an advocate's preparation for judicial proceedings are not entitled to absolute immunity. Rather, absolute immunity shields those acts undertaken by a government attorney in preparation for judicial proceedings *and* which occur in the course of his or her role as an advocate for the government. *See*

10

*Buckley*, 509 U.S. at 273; *Mink*, 482 F.3d at 1261 (reasoning that the "determinative factor" in the absolute immunity inquiry is "advocacy").

Applying this rule to the facts of our case, we easily conclude that Defendants Hernandez, Zarr, and Bullock are entitled to absolute immunity for their acts of preparing and filing the motion for a protective order.[3] Unquestionably, such acts are "intimately associated" with the judicial process, falling within the advocacy function of the city attorneys assigned to defend the city clerk against Plaintiffs' §1983 action. *Imbler*, 424 U.S. at 430. Any lesser immunity could impair the performance of a central actor—government defense counsel—in the "judicial process." *Malley*, 475 U.S. at 343. This possibility of impairment is unacceptable. Moreover, the public trust of the city attorney's office might suffer if it were constrained

---

[3]    We take judicial notice of the fact that only Defendants Zarr and Bullock entered their appearances for Howard in Padilla's state court action. We further note that Plaintiffs' § 1983 complaint alleges absolutely *no facts* to support its conclusory allegation that the city attorney, Defendant Hernandez, somehow acted in concert with Defendants Howard, Zarr, and Bullock to deprive Plaintiffs of their First Amendment rights.

While Hernandez, *if* involved in the preparation and filing of the motion for a protective order, is entitled to absolute immunity for the very same reasons as are Zarr and Bullock, Plaintiffs' § 1983 claims against Hernandez from the outset appear in tension with Fed. R. Civ. P. 11(b)'s pleading requirement that a complaint's "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation and discovery." The rules of pleading set out in Fed. R. Civ. P. 8 do "not require 'detailed factual allegations,'" but demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

11

in making decisions by its attorneys' own potential liability for damages in a § 1983 suit. *Imbler*, 424 U.S. at 424–25.

Absolute immunity for the city attorneys in this case is necessary to protect their independent judgment by freeing them from the possibility of harassment and intimidation associated with their defense of the city clerk. *Burns*, 500 U.S. at 494 ("Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation."). This, in turn, shields and protects the state court's truth-finding mission and decision-making process. Accordingly, the underlying merit or ostensible reach of the motion about which Plaintiffs persistently complain is beside the point. The Supreme Court has acknowledged that "for some 'special functions,' it is better to leave unredressed the wrongs done by dishonest [officials] than to subject those who try to do their duty to the constant dread of retaliation." *Id.* at 484 (citation omitted). "At the same time, the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Butz*, 438 U.S. at 512.

Of course, the possibility of professional and criminal redress, as well as monetary and other sanctions, remain available against those who would abuse the judicial process. Absolute immunity, however, may leave the "genuinely wronged" without civil redress in a *collateral* proceeding

12

against those public officials responsible.[4] *Imbler*, 424 U.S. at 427. But qualifying the civil immunity of the city attorneys in their roles as advocates for the city would "disserve the broader public interest." *Id.* Such qualification might prevent the "vigorous and fearless" defense of the city clerk that is essential to the proper functioning of both the judicial and election processes. *Id.* The Second Circuit said it best:

> [The government defense attorney's] image may not be comparable to that of a prosecutor, but it is not difficult to conceive of situations where, although the government is the defendant, its counsel asserts [matters] tending to upset or excite resentment on the part of the civil plaintiff. . . . Although government defense counsel, not having selected the other party as the target of litigation, is in a more passive position than a prosecutor . . . he nevertheless functions in an adversarial arena where "there is, if not always a winner, at least one loser," and since he is charged with a public trust he should not be inhibited in the faithful performance of his duties by the threat of harassing lawsuits against him. His function as a government advocate therefore entitles him to absolute immunity, which is "necessary to assure that *advocates* can perform their respective functions without harassment or intimidation."

*Barrett*, 798 F.2d at 572 (citation and ellipses omitted).

Accordingly, we hold a government defense attorney who, in the course of a civil adjudication, prepares a motion and arranges for the presentation of evidence on the court record by way of affidavit in support of the motion, is absolutely immune from a collateral § 1983 suit for

---

[4]    We in no way suggest Plaintiffs were "genuinely wronged" when Defendant Howard filed her motion for a protective order.

13

damages based on the filing of such motion and affidavit. *See Butz*, 438 U.S. at 517.

## IV.  City Clerk

For the claims against Defendant Howard, we affirm the dismissal based on qualified immunity because Plaintiffs did not suffer a constitutional violation.

Under the first prong of qualified immunity, Plaintiffs bear a burden to plead facts showing that the defendant violated a constitutional right.[5] *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). Plaintiffs invoke the First Amendment right to protection from retaliation for engaging in protected activity. This claim requires allegations indicating that the conduct would have chilled a person of ordinary firmness from engaging in a protected activity.[6] *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008).

The retaliation claims are based on Howard's filing of a motion for a protective order in state court. In this motion, Howard asked the state court to prohibit Plaintiffs and others "from engaging in conduct directed at

---

[5]   Under the second prong of qualified immunity, Plaintiffs must show that the right was "clearly established" when the public official acted. *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).

[6]   Plaintiffs must also plead that (1) they were engaging in a protected activity and (2) the public official's action was substantially motivated by the plaintiffs' protected activity. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008).

[Howard's] person, which a reasonable person would find to be annoying, alarming, hostile or menacing in nature." *Id.* at 19. Though the state court never ruled on the motion, Plaintiffs argue that the mere filing of the motion created a chilling effect.

This argument is foreclosed by *Shero v. City of Grove, Okla.*, 510 F.3d 1196 (10th Cir. 2007). In *Shero*, the City of Grove initiated a state-court proceeding against a citizen by filing a "Motion for Protective Order and Order Determining Certain Materials Exempt from Public Disclosure." 510 F.3d at 1199. The state district court treated this motion as a complaint for a declaratory judgment. *Id.* In reaction to this filing, the citizen sued in federal court for retaliation in violation of the First Amendment, claiming that the city's filing of a declaratory judgment suit had chilled him from exercising his First Amendment rights. *Id.* at 1203. The federal district court granted summary judgment to the city and we affirmed, holding that "being properly named as a defendant in a declaratory judgment suit, however styled, would not chill a person of ordinary firmness from continuing to engage in constitutionally protected activity." *Id.* at 1204.

*Shero* presented a stronger retaliation claim than the one here. In *Shero*, the city began the lawsuit; here, Padilla began the lawsuit. Yet the panel in *Shero* held as a matter of law that the city's filing of a declaratory judgment suit would not chill a person of ordinary firmness. Under *Shero*, Howard's motion for a protective order would not chill a person of

15

ordinary firmness. So Plaintiffs did not allege a violation of the First Amendment, and the absence of such an allegation entitles Howard to qualified immunity. We thus affirm the dismissal of the claim against Howard based on qualified immunity.[7]

## V. Conclusion

For the foregoing reasons, we affirm the district court's judgment.[8]

---

[7] Defendant Howard relies not only on qualified immunity but also on absolute immunity. Given Howard's entitlement to qualified immunity, we need not decide whether she also enjoys absolute immunity. *See, e.g.*, *Ashcroft v. Al–Kidd*, 563 U.S. 731, 744 (2011) ("Because [the defendant] did not violate clearly established law, we need not address the more difficult question whether he enjoys absolute immunity.") We thus express no opinion or suggestion as to Howard's separate argument involving absolute immunity.

[8] In their opening appellate brief, Plaintiffs also contend that the district court violated the First Amendment by orally suggesting that Defendants consider seeking attorney's fees if Plaintiffs appeal. Plaintiffs' contention is meritless.

No. 18-2027, *Benavidez v. Howard*

**BALDOCK**, Circuit Judge, concurring in the judgment only as to Part IV.

I concur fully in Parts I–III of the Court's opinion. As to Part IV, I concur only in the Court's judgment affirming dismissal of the claims against Defendant Howard.

\* \* \*

The Court holds Defendant Howard, the city clerk, is entitled to qualified immunity because Plaintiffs' § 1983 complaint fails to allege a constitutional violation against her. In disposing of the case against her on such ground, however, the Court inexplicably bypasses the question of whether Defendant Howard is entitled to the greater protections of absolute immunity. I would not bypass this question, but instead would decide under the facts of this case that she is entitled to absolute immunity from § 1983 liability both as a *party* to the state court proceedings and a *witness* offering evidence therein. A public official whose attorneys recommend that she file a motion supported by her verified affidavit should not have to inquire of her attorneys whether she might be sued in a collateral action if she files the motion and affidavit. After today, I wonder if an attorney must inform such a client that any motion filed in support of the client's cause or any evidence presented in support thereof may result in her adversary suing the client for damages in a collateral § 1983 action?

Let us begin with Defendant Howard's role as a party to the state court proceedings out of which this § 1983 action arises. The city attorney's office represented Defendant Howard in her capacity as city clerk. This Court correctly grants the named Defendants from that office, Hernandez, Zarr, and Bullock, absolute immunity from Plaintiffs' § 1983 claims.

Of course, the foundation upon which the client-attorney relationship rests is that of principal and agent. The agent is the principal's representative. Whatever functions the agent performs, therefore, in the prosecution of the business for which he has been summoned, are the acts of the principal whom he represents. *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 498 (1899). Thus, the reason escapes me why Defendant city attorneys, as agents of Defendant Howard, are entitled to absolute immunity for their role in the filing of *her* motion for a protective order and sworn affidavit, but Defendant Howard, the principal whom they represent, is not. Protecting the attorney but not the client in cases like this one is not only nonsensical but also wrought with peril.

Whether absolute immunity protects a public official engaged in litigation depends *not* upon the identity of the official as a party or witness, but *only* upon "the nature of the function performed." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). We ask (1) whether the function performed constitutes an integral part of the judicial process, and if so, (2) whether any degree of immunity less than absolute, *i.e.*, qualified immunity, "*could* impair the judicial process itself." *Malley v. Briggs*, 475 U.S. 335, 342 (1986) (emphasis added). The filing of a motion for a protective order and sworn affidavit to support it in the context of ongoing civil litigation, such as occurred here, unquestionably constitutes an integral part of the judicial process. And failing to cloak the public official filing the motion and affidavit with absolute immunity clearly threatens to impair the judicial process by throwing a monkey wrench into the attorney-client relationship.

2

Absolute immunity for a party filing a motion, like Defendant Howard, promotes the public policy underlying such immunity by inhibiting interference between client and counsel engaged in adversarial litigation. Uninhibited and unchilled communication between client and counsel is an essential ingredient of a fair and just judicial process. The failure to provide a public official absolute immunity from § 1983 liability for filing a motion while cloaking her attorneys with such immunity threatens to create a conflict between client and counsel, in turn jeopardizing the independence of counsel and vigorous advocacy demanded by the Code of Professional Responsibility and vital to the effective functioning of our adversarial system and its truth-finding mission. Foremost, the client may worry about being sued collaterally if she files a motion, while her counsel, who enjoys absolute immunity, may think the motion is necessary to an effective prosecution or defense. Alternatively, counsel may worry about being sued in malpractice if the client is subsequently charged in a collateral action for filing a motion then thought to be necessary to an effective prosecution or defense of the underlying lawsuit. Or in a worst case scenario, an adversary with a weak hand may opt to pursue a collateral action in order to create tension between client and counsel and divert attention away from the deficiencies in her case. The mere possibility that the client may have an interest adverse to her attorney jeopardizes the attorney-client relationship and, in turn, the effective functioning of the judicial process.

Here, Defendant Howard filed a motion through and upon the advice of her counsel that she believed necessary to ensure her ability to present an effective defense to Plaintiff

3

Padilla's state court claims. The filing of this motion alone is enough to establish her entitlement to absolute immunity from a § 1983 collateral lawsuit based on the contents of the motion. Nonetheless, let us not forget Defendant Howard's role as a witness in addition to her role as a party to the state court proceedings. To render testimony in her own defense, Defendant Howard supported her motion with a sworn affidavit. This affidavit constituted her personal appearance before the state court. Black's Law Dictionary 1704 (10th ed. 2014) (defining "testimony" as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition"); Webster's Third New Int'l Dictionary 2362 (1981) (including "a written attestation" within the definition of "testimony").

Unsurprisingly, "[t]he immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law" undoubtedly because the function they performed was an integral part of the judicial process. *Briscoe v. LaHue*, 460 U.S. 325, 330–31 (1983). This only stands to reason for both parties and witnesses who aid the truth-seeking mission of the judiciary should be no more liable to collateral suits for what they *say and do* in the discharge of their respective functions in the judicial arena than are judges and lawyers. *Yaselli v. Goff*, 12 F.2d 396, 406 (2d Cir. 1926), *aff'd*, 275 U.S. 503 (1927) (per curiam). As Lord Mansfield declared nearly 250 years ago when speaking of the common law's "litigation privilege:" "Neither party, witness, counsel, jury, nor judge, can be put to answer . . . for words spoken in office." *King v. Skinner*, 98 Eng. Rep. 529, 530 (1772). The rationale for Lord Mansfield's proclamation

4

as well as the Supreme Court's subsequent absolute immunity decisions—to free the judicial process of harassment and intimidation that might alter a court's decision-making process and truth-finding mission—applies equally to parties and other witnesses presenting sworn evidence before a court. *Forrester v. White*, 484 U.S. 219, 226 (1988). Any erosion of the rule of absolute immunity for witnesses might invite new claims by unhappy litigants. At the very least, such erosion as occurs today may deter individuals in a position to offer valuable testimony to the court, thereby undermining the truth-seeking function of the original proceeding by depriving the court of candid, objective, and undistorted evidence.

\* \* \*

The public policy behind absolute immunity in the present context is the protection of the judicial process itself. Such immunity bars claims that may very well deter public officials engaged in the process from performing their respective functions in such a manner that the truth is free to prevail. The Court turns a blind eye to all this and fails to recognize that its refusal to grant, let alone consider, absolute immunity for Defendant Howard poses a real threat to the proper functioning of the judicial process. The bottom line is simply this: If an adversary does not like what the opposing party presents to a court by way of motion, the adversary must oppose the motion and take whatever other action deemed necessary *in the underlying lawsuit*. This places the decision to sanction a party or witness under the authority of the presiding judge assigned to adjudicate the motion rather than in the hands of a disgruntled adversary such as Plaintiffs in this case.

If the risk of being haled into federal court to defend a collateral § 1983 suit is added to the deterrent of being sanctioned by the state court, or charged with perjury or subornation (absolute immunity does not protect criminal conduct), the risk of self-censorship detrimental to the court's fact-finding mission becomes far too great. For this reason, I would hold as follows: A public official who, in the course of civil adjudication, assists her attorneys in preparing a motion on her behalf and arranging for the presentation of evidence on the record by way of a supporting affidavit, is absolutely immune from a collateral § 1983 suit for damages based on the filing of such motion and affidavit.